Robert A. **MUSCHETTE**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 17410.

United States Court of Appeals
District of Columbia Circuit.

Argued May 8, 1963.

Decided July 25, 1963.

Petition for Rehearing En Banc
Denied Sept. 25, 1963.

Chief Judge Bazelon and Circuit Judge
Wright would grant the petition.

Wright, Circuit Judge, dissented.

Mr. Alfred L. Scanlon, Washington, D.
C. (appointed by this court), for appellant.

Mr. William C. Pryor, Asst. U. S.
Atty., with whom Messrs. David C.
Acheson, U. S. Atty., and Frank Q.
Nebeker and Harold H. Titus, Jr., Asst.
U. S. Attys., were on the brief, for appellee.

Before PRETTYMAN, Senior Circuit
Judge, and WILBUR K. MILLER and
WRIGHT, Circuit Judges.

PER CURIAM.

Robert A. Muschette and another were
indicted May 8, 1961, for housebreaking
and petit larceny. In a trial which began
June 19, 1961, the jury was unable to
reach a verdict, but a second trial in the
following December resulted in conviction. Muschette was sentenced to imprisonment for a term of from two to
six years to run concurrently with a
four-to-twelve-year sentence imposed in
an unrelated case in June, 1961, which he
was serving when he was tried in the
present case.

Muschette appeals, urging that his confession, without which he says he could
not have been convicted, was extracted
from him by physical abuse during a
period of unnecessary delay in presenting
him to a committing magistrate following his unlawful arrest without a warrant.

Evidence for the prosecution showed
that during the night of April 6-7, 1961,
police were attracted to a clothing store
by the ringing of its burglar alarm. The
store had been entered from an adjoining

vacant building through a hole dug in the masonry wall, and a small safe had been carried from the first floor to a landing halfway up stairs leading to the second floor. The burglars set off the alarm as they ascended the stairs, so they abandoned the safe on the landing and fled the scene.

The officers found near the hole a sledge hammer, a watch, a crowbar and an army duffel bag containing a hacksaw and another crowbar. Imprinted on the duffel bag were a name and army serial number: "Jeffrey H. Matthews 13491323." It was revealed during a hearing out of the presence of the jury that Jeffrey H. Matthews, having been located and interviewed by the police, acknowledged ownership of the bag and stated he had last seen it about two weeks before when he was living with Robert A. Muschette at 403 M Street, N. E.

At about 2:00 p. m. April 7, police officers went to that address with the obvious purpose of asking Muschette about the duffel bag Matthews had said he had left there. They interviewed him in his upstairs room, to which he invited them to get away from the noise of a party going on in the lower part of the house. The officers observed in plain view a pair of trousers on which brick and mortar dust was seen. When Muschette, who admitted he owned the trousers, was asked about the source of the brick and mortar dust, he appeared confused and told two conflicting stories. Thereupon, at about 2:20 p. m. the officers arrested him and took him to the Safe Squad office in police headquarters, arriving there about 2:35 p. m. Within ten minutes thereafter, Muschette made an oral confession which took about five or ten minutes. Typing the statement was somewhat delayed because the stenographer assigned to that office was ill and arrangements had to be made for a typist from another office. However, it was completed and signed by Muschette

and witnessed about 3:45 p. m. He was presented to the United States Commissioner a few minutes after 4:00 o'clock.

Prior to the trial, Muschette made a *pro se* written motion to suppress as evidence the articles taken from his room, contending that his arrest was illegal because the police did not have a warrant or probable cause and that therefore the seizure was unlawful. The motion was denied, but none of the articles seized was introduced as evidence in the subsequent trial.

Testifying at the trial, Muschette fixed the visit of the officers at an earlier hour, thus enlarging the interval between his arrest and his presentment to the Commissioner. He also claimed they arrested him before they had seen the soiled trousers. He denied committing the crime and repudiated the confession, saying the officers were repeatedly striking him on the sides of his head with a telephone directory [1] and he confessed to avoid the continuance of this physical abuse. The question whether the confession was voluntary was submitted to the jury and its verdict shows it did not accept Muschette's statement that he had been coerced by police brutality.

The discovery of Jeffrey Matthews' duffel bag containing burglary tools and his statement about it fully justified the police in going to 403 M Street and interviewing Muschette about it. Indeed, the information then in hand required that they inquire of Muschette whether the duffel bag had in truth ever been in his house, and if so how it happened to be at the scene of the crime. But clearly at that point they had no cause to arrest Muschette. Naturally Matthews assigned the incriminating bag to some place other than his own possession, but the probability of the truth of his immediate response was, to say the least, doubtful. There may have been, at that stage of events, cause to arrest Matthews but certainly none to arrest Muschette.

1. The Washington telephone directory is so large and heavy that a lethal blow could be struck with it.

And, moreover, even Matthews did not inculpate Muschette; he merely said he had left the bag at Muschette's house. So the officers went to Muschette's house.

The officers knew the burglars had broken through a brick wall into the store where the duffel bag and the burglary tools were discovered; and, of course, they had seen the litter of shattered brick and mortar caused by breaking the opening through which the burglars had crawled. On a chair in Muschette's room, in plain view, was a pair of trousers and on the trousers was telltale brick and mortar dust. Muschette admitted ownership but told conflicting stories. Here, then, in the cumulated data, was probable cause, so they arrested him.

As the jury determined, from evidence which amply justified their conclusion, that the confession had not been extracted by police brutality but was voluntarily given, we turn to consider whether, after Muschette's arrest, there was unnecessary delay in presenting him to a committing magistrate which, under the Supreme Court's Mallory holding,[2] rendered the confession inadmissible even though it was voluntarily given.

Muschette was arrested at 2:20 p. m., arrived at the Safe Squad office after a ride in a squad car at 2:35, and orally confessed not later than 2:45. So, the oral confession began about 25 minutes after the arrest. The confession was reduced to typewritten form and signed and witnessed by 3:45 p. m. Thus it took an hour for the oral confession to be given, a typist from another office to be located and secured, the statement to be typed, read, signed and witnessed. Then, about 20 minutes later, Muschette was taken before the Commissioner. Thus the total time lapse between arrest and presentment was about an hour and 35 to 45 minutes.

Certainly the 25 minutes—which included the 15-minute ride to the station house—between Muschette's arrest and the beginning of his oral admission of guilt involved no delay. And, as we said in the Heideman case,[3] "Delay after a confession is less crucial than delay before a confession." Even so, the time here, which encompassed not only the typing, etc., but the administrative routine of charging, booking, fingerprinting, etc., indicates no delay.

Evaluations of situations such as this should be realistic. The extraction of a confession by whatever means is outlawed and its products are not admissible in a court of law. But the "Mallory Rule" is not a carpenter's measuring stick to be used by merely laying it alongside the material to be evaluated. It was not intended, we think, to be a mechanical rule that in all instances the mere passage of a given length of time would require the rejection of a confession. The problem is not to be solved by watching the clock; the solution is to be reached by determining whether the delay which occurred was in fact unnecessary when the sum total of the circumstances shown is considered.

We emphasize that this record contains no suggestion that the confessions were extracted by questioning. Muschette did not claim they were. He said they were beaten out of him; but the jury did not believe him, so that problem is not for us.

We comment further that the typing and signing of a confession voluntarily given is not always and exclusively a detriment to the accused because, once written, his statement cannot be changed by his accusers. Written versions of statements by prospective witnesses are well-nigh universal practice. What the witness—or an accused—said is not thereafter the subject of convenient recollection. So the typing of a voluntary confession is neither unnecessary or unreasonable. We think that in the present case it was proper procedure.

2. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

3. Heideman v. United States. 104 U.S. App.D.C. 128, 130, 259 F.2d 943, 945 (1958), cert. denied 359 U.S. 959, 79 S.Ct. 800, 3 L.Ed.2d 767 (1959).

■ We think the one hour and 20 minutes occupied by the various activities described here was not, under the circumstances, unreasonable and cannot properly be characterized as unnecessary. We are quite clear that there was no unnecessary delay in presenting Muschette to a committing magistrate within the meaning of Criminal Rule 5(a) as construed by the Mallory holding of the Supreme Court.

Affirmed.

J. SKELLY WRIGHT, Circuit Judge (dissenting).

In McNabb v. United States, 318 U.S. 332, 343–344, 63 S.Ct. 608, 614, 87 L.Ed. 819 (1943), the Supreme Court, in applying former 18 U.S.C. § 595, the predecessor statute to Rule 5(a), F.R.Crim.P.,[1] stated:

"The purpose of this impressively pervasive requirement of criminal procedure is plain. * * * For this procedural requirement checks resort to those reprehensible practices known as the 'third degree' which, though universally rejected as indefensible, still find their way into use. It aims to avoid all the evil implications of secret interrogation of persons accused of crime. It reflects not a sentimental but a sturdy view of law enforcement. It outlaws easy but self-defeating ways in which brutality is substituted for brains as an instrument of crime detection. A statute carrying such purposes is expressive of a general legislative policy to which courts should not be heedless when appropriate situations call for its application."

The McNabb opinion closed with the observation that "[t]he history of liberty has largely been the history of observance of procedural safeguards. And the effective administration of criminal justice hardly requires disregard of fair procedures imposed by law." 318 U.S. at 347, 63 S.Ct. at 616, 87 L.Ed. 819.

This routine criminal case, coming some twenty years after the decision in McNabb, demonstrates not only the continuing validity of the McNabb-Mallory [2] doctrine, but also the fact that its prophylactic command continues to be disregarded. The appellant here maintains that the police invaded his home without a warrant and without his permission, searched his bedroom, and subjected him to extensive, but fruitless, questioning there before taking him down to police headquarters and coercing him to confess through the administration of physical brutality. The police deny these allegations while admitting that they did indeed go to appellant's home to question him about a safe robbery. There, according to the police, they were invited to his bedroom where they discovered incriminating evidence in open view. The police further state that, after some questioning in which the appellant refused to admit his participation in any crime, they arrested him and took him to the "Safe Squad Office" [3] at police headquarters where he readily and voluntarily made a full confession in ten minutes.

Thus we have presented a situation which McNabb, Upshaw,[4] Mallory, and their progeny were intended to avoid: allegations of police brutality in abstract-

1. Rule 5(a), in pertinent part, provides: "An officer making an arrest * * * shall take the arrested person without unnecessary delay before the nearest available commissioner * * *."

2. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

3. It appears that the "Safe Squad Office" is one of several rooms at police headquarters similar to the "Homicide Squad Office," the "Vice Squad Office," and the "Stolen Vehicle Office," where investigation and interrogation with respect to particular crimes are conducted by officers experienced in these specialties.

4. Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100 (1948).

ing a confession before the person arrested comes under the protection of the committing magistrate, and a denial of the brutality by the police. Congress and the courts have realized that the testimony of a lone defendant under these circumstances is ordinarily no match for testimony from several police officers who could not, of course, be expected to admit brutality in any event, since one who would be guilty of such conduct would find little difficulty in denying it under oath.[5] On the other hand, Congress and the courts have also recognized that many of the claims of police brutality have little substance, but, nevertheless, are sometimes given credence when arrested persons are unduly delayed in police custody before being transferred to judicial custody. These twin evils Rule 5(a) was designed to eliminate.

Mallory, in declaring an uncoerced confession obtained in violation of Rule 5(a) inadmissible in evidence, stated that an arrested person "is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt." 354 U.S. at 454, 77 S.Ct. at 1359, 1 L.Ed.2d 1479. Here, instead of being taken to the nearest commissioner without unnecessary delay as required by Rule 5(a), appellant was taken to the Safe Squad Office at police headquarters "in order to carry out a process of inquiry" which resulted in a confession. That the police were able to obtain the confession quickly, once the defendant was in the Safe Squad Office, does not make the violation of his rights less objectionable or the confession more reliable.

The important fact is that the police delayed until appellant confessed, and then brought him before the commissioner.

I respectfully dissent.

---

5. See Hogan and Snee, The McNabb-Mallory Rule: Its Rise, Rationale and Rescue, 47 Geo. L.J. 1, 27 (1958).